AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)      ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

| FILED | LODGED |
|---|---|
| CLERK, U.S. DISTRICT COURT | CLERK, U.S. DISTRICT COURT |
| 4/8/22 | 4/8/2022 |
| CENTRAL DISTRICT OF CALIFORNIA | CENTRAL DISTRICT OF CALIFORNIA |
| BY: _____ nne _____ DEPUTY | BY: _____ VAM _____ DEPUTY |

United States of America

v.

JULIO ERNESTO LOPEZ-MENENDEZ,
        Defendant(s)

Case No.    2:22-mj-01447-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of January 4, 2022 in the county of Los Angeles in the Central District of California, the

defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), 846 | Possession with Intent to Distribute and Distribution of Drugs, and Conspiracy |
| 18 U.S.C. § 922(a)(1)(A) | Engaging in the Business of Dealing in Firearms Without a License |
| 26 U.S.C. § 5861(d) | Possession of an Unregistered Firearm |

This criminal complaint is based on these facts:

 *Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
_____
*Complainant's signature*

Andrew Grigoriadis, Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    April 8, 2022, 4:59 p.m.
_____
*Judge's signature*

City and state:    Los Angeles, California

Hon Maria A. Audero, U.S. Magistrate Judge
_____
*Printed name and title*

## **AFFIDAVIT**

I, Andrew Grigoriadis, being duly sworn, declare and state as follows:

## I. **INTRODUCTION**

1.   I am a Special Agent ("SA") for the Federal Bureau of Investigation ("FBI") and have been so employed since January 19, 2021.  I am currently assigned to the Los Angeles Field Division Southern California Drug Task Force, High Intensity Drug Trafficking Area ("HIDTA").  HIDTA is a task force comprised of agents and officers from federal, state, and local agencies, assigned to investigate large-scale narcotics trafficking.

2.   I have participated in the identification of members of drug trafficking organizations using telephone records and bills, photographs, and other documents.  I have assisted in the handling of confidential sources, executed search warrants for controlled substances, and conducted physical and electronic surveillance in connection with narcotics investigations.  Based on my experience and training with the FBI, I am familiar with the methods used in narcotics trafficking operations including their use of firearms.

3.   In my training at the FBI Academy, I was trained on the proper handling, firing, and identification of firearms.  I have participated in the identification of members of drug trafficking and criminal organizations who have facilitated the manufacture and sale of firearms in order to fund additional aspects of their criminal activity.  I have worked and spoken

with investigators with the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF") who have provided me with information regarding firearms trafficking and possession crimes based on their training, experience, and knowledge of firearms trafficking cases.

4.    From my training, experience, and knowledge I know that drug and firearms traffickers often use coded language when speaking about their trafficking activity to avoid detection by law enforcement.

## II. <u>PURPOSE OF AFFIDAVIT</u>

5.    This affidavit is made in support of a criminal complaint against, and arrest warrant for, JULIO ERNESTO LOPEZ-MENENDEZ, also known as "Iroe" ("LOPEZ-MENENDEZ") for violations of 21 U.S.C. §§ 841(a)(1), 846 (possession with intent to distribute and distribution of drugs, and conspiracy); 18 U.S.C. § 922(a)(1)(A) (engaging in the business of dealing in firearms without a license); and 26 U.S.C. § 5861(d) (Possession of an Unregistered Firearm).

6.    This affidavit is also made in support of search warrants for the following:

        a.    The property located at 6724 Amigo Avenue, Reseda, California 91335 (hereinafter "SUBJECT PREMISES"), further described in Attachment A-1;

        b.    The person of LOPEZ-MENENDEZ, described in detail in Attachment A-2, and the property on his person, including, but not limited to, any pockets in the person's clothing, and any bags or other containers carried or held by the person,

provided that this person is located within the Central District of California at the time of the search; and

   c. A white 2017 Mercedes-Benz sport utility vehicle bearing California license plate number 8UBN231, as described in Attachment A-3 (the "SUBJECT VEHICLE"), provided that the SUBJECT VEHICLE is in the Central District of California at the time of the search.  Attachments A-1 through A-3 are incorporated herein by reference.

   7. The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1), 846 (possession with intent to distribute and distribution of drugs, and conspiracy); 18 U.S.C. § 922(a)(1)(A) (engaging in the business of dealing in firearms without a license); and 26 U.S.C. § 5861(d) (Possession of an Unregistered Firearm) (the "SUBJECT OFFENSES"), as described more fully in Attachment B, which is incorporated herein by reference.

   8. The facts set forth in this affidavit are based upon my personal observations, my training and experience, the training and experience of other experienced law enforcement personnel that are assisting this investigation, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically

indicated otherwise, all conversations and statements described
in this affidavit are related in substance and in part only.

### III. <u>SUMMARY OF THE INVESTIGATION</u>

9.    Since December of 2021, LOPEZ-MENENDEZ has met
numerous times with an ATF agent working in an undercover
capacity (the "UC").  Over those meetings, LOPEZ-MENENDEZ sold
to the UC approximately 17 pounds of suspected methamphetamine
and at least 70 firearms, which included three illegally short-
barreled firearms, none of which have been registered to him in
the National Firearms Registration and Transfer Record.  On
three occasions LOPEZ-MENENDEZ sold the UC both suspected
methamphetamine and at least one firearm during the same
transaction.  LOPEZ-MENENDEZ does not have a federal firearms
license that authorizes him to engage in the business of dealing
in firearms.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

10.   The following is based on my joint investigation with
the ATF, conversations with co-case agents FBI SA Dennis An, ATF
SA Travis Gibb, ATF SA Jamie Pedersen, the UC, and other
investigators, my review of recorded text message, phone, and
in-person conversations between LOPEZ-MENENDEZ and the UC, and
my review of lab reports, investigative reports, and other
documents.

11.   In December of 2021 the UC was introduced to LOPEZ-
MENENDEZ, who provided the UC with his phone number, (213) 421-
7771 (the "7771 number").  Subsequently, LOPEZ-MENENDEZ offered

to sell the UC firearms and directed the UC to go to the SUBJECT PREMISES to conduct these future transactions.

12. As shown in the following table, since January 2022, LOPEZ-MENENDEZ has sold to the UC approximately 70 firearms and approximately 17 pounds of methamphetamine over the course of eight transactions, all of which occurred at the SUBJECT PREMISES.[1]

| Date | Location | Firearms Sold | Methamphetamine sold | Price |
|---|---|---|---|---|
| 1/6/2022 | SUBJECT PREMISES | 8 | | $8,000 |
| 1/20/2022 | SUBJECT PREMISES | 12 | | $10,700 |
| 1/31/2022 | SUBJECT PREMISES | 9 | 1 pound | $11,600 |
| 2/10/2022 | SUBJECT PREMISES | 14 | 1 pound | $15,000 |
| 2/24/2022 | SUBJECT PREMISES | 16 | | $18,000 |
| 3/1/2022 | SUBJECT PREMISES | 10 | | $12,800 |
| 3/8/2022 | SUBJECT PREMISES | 1 | 10 pounds | $15,000 |
| 3/23/2022 | SUBJECT PREMISES | | 5 pounds | $6,750 |
| | **TOTAL** | **70** | **17** | **$97,850** |

A. **Identification of SUBJECT PREMISES and LOPEZ-MENENDEZ's Associates**

13. On January 4, 2022, at approximately 6:33 p.m., LOPEZ-MENENDEZ texted the UC: "You think you'll be able to pick them up at my house," adding: "6724 amigo ave," and "That's my addy my boy." LOPEZ-MENENDEZ confirmed the address was in Reseda. As set forth in the table above, on January 6, 2022, LOPEZ-

---

[1] LOPEZ-MENENDEZ's address of record with the California Department of Motor Vehicles is 1542 North Glendale Boulevard, Los Angeles, California 90026. Surveillance has observed that he appears to spend most nights at 268 North Wilson Avenue, Pasadena, California 91106, believed to be the residence of his girlfriend. As noted below, LOPEZ-MENENDEZ referred to the SUBJECT PREMISES as his address.

MENENDEZ met the UC at the SUBJECT PREMISES and sold eight firearms to the UC for $8,000.

14.   On January 20, 2022, LOPEZ-MENENDEZ met the UC at the SUBJECT PREMISES and sold to the UC 12 firearms, including a Smith & Wesson 9mm M&P Shield bearing serial number JDA6531, a Mossberg 12-gauge model 590 firearm resembling a short-barreled shotgun,[2] bearing serial number V1280682, and ten 9mm caliber ghost gun[3] pistols bearing no serial numbers.

    a.   During this meeting, the UC asked about how LOPEZ-MENENDEZ and his associates were manufacturing firearms. In response, LOPEZ-MENENDEZ brought the UC through the gate of the SUBJECT PREMISES to an outdoor tented area at the rear of the SUBJECT PREMISES and introduced the UC to two Hispanic male individuals whom LOPEZ-MENENDEZ referred to as his cousins. These individuals were later identified as Michael Ojeda ("Ojeda")[4] and Carlos Delgadillo ("Delgadillo").

    b.   During the ensuing recorded conversation, LOPEZ-MENENDEZ, Ojeda, and Delgadillo explained to the UC the process of manufacturing firearms, including the use of equipment like

---

[2] Federal law prohibits the unregistered possession of a shotgun with a barrel or barrels of "less than 18 inches of length" under 26 U.S.C. §§ 5845, 5861(d).

[3] A "ghost gun" refers to a firearm that does not have a serial number and was not manufactured by a federal firearm licensed manufacturer.  As described further below, ghost guns are often assembled from parts purchased separately or in a kit. Because the separate parts do not bear serial numbers, the assembled ghost gun does not bear a serial number, and thus cannot be registered or traced.

[4] A search of law enforcement databases show that Ojeda has listed the SUBJECT PREMISES as his residence as recent as February 8, 2022.

a jig, files, and drills to convert what is commonly referred to as "80% lower receivers" or "unfinished" receivers into functioning firearms.  The UC observed a hand drill in the tented area.

       c.  In my training, experience, and knowledge of firearms manufacturing cases, which includes information provided by other experienced agents at the FBI and the ATF, I know that individuals can assemble firearms from various parts and components, including parts that require certain holes to be drilled into them in order for the assembled firearm to function, including unfinished lower receivers.

       d.  An unfinished lower receiver is identical to the lower receiver of a functioning firearm except that it is missing certain holes that are necessary for it to be assembled into a functioning firearm.  Unfinished lower receivers are commercially manufactured and available for purchase to the public without regulation.  They usually do not have serial numbers.  An unfinished lower receiver can be converted into a usable receiver — that lacks a serial number and thus cannot be traced — simply by drilling those necessary holes with tools like the ones described in the discussion with LOPEZ-MENENDEZ, Ojeda, and Delgadillo, including a drill like the one observed by the UC in the tented area of the SUBJECT PREMISES.  Current California state firearms regulation requires those self-manufacturing unfinished lower receivers into working firearms to register the completed firearm and add a serial number.  If that serial number is not added, then that firearm is commonly

referred to as a ghost gun and is difficult to track because there is no firearm record of when or where it was manufactured or who finished or assembled the firearm.

15.  On or about February 3, 2022, during a recorded telephone call between the UC and LOPEZ-MENENDEZ, the UC asked LOPEZ-MENENDEZ about the Mossberg firearm resembling a short-barreled shotgun that LOPEZ-MENENDEZ sold to the UC on January 20, 2022.

a.  When the UC asked LOPEZ-MENENDEZ if a short-barreled shotgun was illegal, LOPEZ-MENENDEZ responded it was "super illegal."[5]  LOPEZ-MENENDEZ explained that a shotgun with a "high" barrel was legal and that one could shorten the barrel of a shotgun by "sawing them off."

b.  LOPEZ-MENENDEZ said someone is only able to get short-barreled firearms in Texas and Nevada but "licensed".  The UC inquired if the same laws apply to short-barreled rifles, to which LOPEZ-MENENDEZ said "yes, because they're short."  The UC asked LOPEZ-MENENDEZ who is it that investigates these types of firearms and LOPEZ-MENENDEZ responded: "I think ATF."

**B.   January 31, 2022: LOPEZ-MENENDEZ Sold Nine Firearms and One Pound of Methamphetamine**

16.  On January 22, 2022, at approximately 8:51 a.m., LOPEZ-MENENDEZ texted the UC from telephone number (747) 230-1022 (the "1022 number") and informed the UC this was his new

---

[5] It appears from these conversations that LOPEZ-MENENDEZ believed the Mossberg firearm was a short-barreled shotgun. Further analysis of the firearm is needed to confirm that it is a shotgun rather than a pistol.

number.  LOPEZ-MENENDEZ used the 1022 number for all his
subsequent phone communications with the UC.

17.  On January 22, 2022, at approximately 1:45 p.m.,
LOPEZ-MENENDEZ texted the UC: "I have something ready for u" and
sent a photograph of an AR-style firearm with a drum ammunition
magazine.

18.  On January 26, 2022, LOPEZ-MENENDEZ texted the UC:
"Have 1 original big one 2200$ 2 big ones ghost 1300$ 8ghost
800$," followed by three photographs of an AR-style pistol with
a drum ammunition magazine.

     a.  I know from my training, experience, and
knowledge of firearms trafficking cases that traffickers often
use coded language to refer to contraband to avoid law
enforcement detection.  Firearms traffickers often use the term
"ghost" to refer to ghost guns (which do not bear serial
numbers" and "original" to refer to commercially-manufactured
firearms.

     b.  Based on the coded language and the attached
photographs of the AR-style pistol, I believe that LOPEZ-
MENENDEZ was offering to sell one rifle manufactured by a
federal firearms licensed manufacturer for $2,200, two AR-style
ghost gun rifles for $1,300 each and eight ghost gun pistols for
$800 each.

19.  On January 27, 2022, LOPEZ-MENENDEZ texted the UC: "I
got that single one as well that you wanted" and "The clear
one[.]" LOPEZ-MENENDEZ indicated in a subsequent text message
that the price of the methamphetamine was $1,350.

a.   I know from my training, experience, and knowledge of this and other drug trafficking cases that "clear" is a term used by drug traffickers to refer to methamphetamine.

20.  On January 30, 2022, while discussing prices for the firearms and methamphetamine over text messages, LOPEZ-MENENDEZ texted the UC a photograph of a ledger with specific pricing for each firearm and the methamphetamine for sale.  As noted below, I know from my training, experience, and knowledge that individuals engaged in drug and firearms trafficking often keep such price lists.  Over text messages, they agreed to conduct the transaction the following day at the SUBJECT PREMISES.

21.  On January 31, 2022, the UC arrived at the SUBJECT PREMISES and parked in the driveway behind the SUBJECT VEHICLE.

a.   LOPEZ-MENENDEZ walked from the SUBJECT PREMISES carrying a white cardboard box and a long brown cardboard box, both of which he gave to the UC.  The long brown cardboard box contained approximately one pound of methamphetamine, one Faxon Firearms model ARAK-21, 7.62 x 39 caliber, AR-type rifle, bearing serial number FF-0553 and one drum ammunition magazine. The white cardboard box contained seven 9mm caliber ghost gun pistols bearing no serial numbers.

b.   LOPEZ-MENENDEZ got into the UC's vehicle with the UC and said his associate was assembling one more rifle inside the SUBJECT PREMISES.  After a short time, LOPEZ-MENENDEZ used his cell phone to call someone to tell them to bring the firearm to the gate area of the SUBJECT PREMISES.  Subsequently, LOPEZ-MENENDEZ met with Ojeda by the gate.  Ojeda gave LOPEZ-MENENDEZ

a black plastic bag, which LOPEZ-MENENDEZ handed to the UC.   The black plastic bag contained what appeared to be a ghost gun AR-type pistol with no serial number.   From this activity, I believe Ojeda was the person LOPEZ-MENENDEZ had spoken to on the phone.

        c.   The UC gave LOPEZ-MENENDEZ approximately $11,600 in United States currency for the firearms and the methamphetamine.   LOPEZ-MENENDEZ said that he expected to receive a shipment of Draco firearms soon and would sell some to the UC for $1,700 per firearm.

     22.   The following photograph shows the firearms and methamphetamine sold by LOPEZ-MENENDEZ on this date:



     23.   On or about February 16, 2022, the Drug Enforcement Administration ("DEA") Southwest Laboratory confirmed that the methamphetamine purchased from LOPEZ-MENENDEZ on January 31, 2022, was approximately 99% pure and contained approximately 440 grams of actual methamphetamine.

### C.    February 10, 2022: LOPEZ-MENENDEZ Sold Fourteen Firearms and One Pound of Methamphetamine

24.  Following the transaction of January 31, 2022, LOPEZ-MENENDEZ texted the UC later that day photographs of a revolver and several semi-automatic pistols, adding "these are gonna be a little hard to hold" because "alot of people are interested but you come 1st."  He added that each firearm would cost $1,400, which was "high cause they're in there [sic] original box."

25.  On February 5, 2022, LOPEZ-MENENDEZ texted the UC: "Shipment of 60 ready" and "Can we make something happen."  He texted the UC descriptions of various firearms for sale, including 60 1911 brand firearms and more ghost guns.  Following further negotiations over text message, including an offer to sell a Sig Sauer pistol for $2,500 that LOPEZ-MENENDEZ said would cost $3,000 at a gun store, LOPEZ-MENENDEZ texted that all the 1911 firearms had been sold but offered to sell semi-automatic pistols and one pound of methamphetamine.  LOPEZ-MENENDEZ agreed to sell the UC firearms and one pound of methamphetamine for $15,000, and they agreed to meet at the SUBJECT PREMISES on February 10, 2022.

26.  On February 10, 2022, the UC drove to the SUBJECT PREMISES and called LOPEZ-MENENDEZ, who said he would come out shortly.  LOPEZ-MENENDEZ walked from the SUBJECT PREMISES holding a large brown cardboard box containing 13 firearms and the pound of methamphetamine, which he placed in the UC's car. LOPEZ-MENENDEZ said he had one more firearm in his vehicle, then

retrieved a black plastic box from the SUBJECT VEHICLE, which
was parked in the driveway of the SUBJECT PREMISES.

a.   While inside the UC's vehicle, the UC opened the
large brown cardboard box, which contained numerous smaller
white boxes marked "Polymer80."[6]  Altogether, the fourteen
firearms consisted of the following: a Glock model 17 semi-
automatic pistol, bearing serial number BTYT360; a Sig Sauer
model P238 semi-automatic pistol, bearing serial number
27C032245; a Sig Sauer model P320 semi-automatic pistol with an
obliterated serial number; a Ruger model LCP semi-automatic
pistol, bearing serial number 72222729; 9 ghost gun pistols with
no serial numbers; and a short-barreled ghost gun AR-type rifle
with no serial number.[7]

b.   LOPEZ-MENENDEZ told the UC that the Glock, Ruger
and Sig Sauer firearms were each $1,400, the Sig Sauer P320
firearm was $2,300, the ghost gun pistols were each $800, and
the short-barreled ghost gun AR-type rifle was $1,200.

c.   LOPEZ-MENENDEZ showed the UC the white box that
contained the pound of methamphetamine in a clear plastic bag.
He said he had a direct connection for methamphetamine at $1,350

---

[6] As discussed further below, Polymer80 is a company,
according to its website, sells 80% lower receivers, firearm
parts, and completed firearms.  I know from my training,
experience, and knowledge of firearms cases that Polymer80 gun
kits are commonly used to build and assemble functioning
firearms.

[7] Federal law prohibits the unregistered possession of a
rifle with a barrel or barrels of "less than 16 inches of
length" under 26 U.S.C. §§ 5845, 5861(d).

per pound and could sell the UC multiple pounds of
methamphetamine at a time.

     d.   The UC paid LOPEZ-MENENDEZ $15,000 for the 14
firearms and the pound of methamphetamine.

    27.  The following photograph shows the firearms and
methamphetamine sold by LOPEZ-MENENDEZ on this date:



    28.  On or about February 28, 2022, the DEA Southwest
Laboratory confirmed that the methamphetamine that LOPEZ-MENDEZ
sold to the UC on February 10, 2022, was approximately 99% pure
and contained approximately 442 grams of actual methamphetamine.

    **D.**   **February 24, 2022: LOPEZ-MENENDEZ Sold 16 Firearms**

    29.  After the transaction of February 10, 2022, later that
day, LOPEZ-MENENDEZ asked the UC over text message how many
pounds of methamphetamine the UC wanted to buy "on the next
run."

    30.  On February 22, 2022, LOPEZ-MENENDEZ texted the UC a
photograph of a revolver, adding that he was going "to the

warehouse in the morning" to "pick up the rest," but "I have 6
originals for u," including a Glock model 43 firearm they had
previously discussed.  I know from my training, experience, and
knowledge of firearms, including information provided to me by
other investigators familiar with firearm trafficking, that
"original" is a term used to describe a commercially
manufactured firearm, as opposed to a ghost gun.  Ultimately,
LOPEZ-MENENDEZ agreed to sell firearms to the UC at the SUBJECT
PREMISES on February 24, 2022.

     31.  On February 24, 2022, the UC arrived at the SUBJECT
PREMISES and observed the SUBJECT VEHICLE parked in the driveway
of the SUBJECT PREMISES.  The UC called LOPEZ-MENENDEZ, who said
he would come out shortly.  Around 12:40 p.m., LOPEZ-MENENDEZ
and Ojeda came out of the SUBJECT PREMISES.  LOPEZ-MENENDEZ was
wearing a red backpack and holding a black plastic bag
containing two ghost gun short-barreled AR-type rifles, which he
handed to the UC.  Ojeda was holding a large brown cardboard box
containing nine ghost gun pistols, which he handed to LOPEZ-
MENENDEZ.  The UC and LOPEZ-MENENDEZ placed the black plastic
bag and the cardboard box in the UC's car.  LOPEZ-MENENDEZ got
into the UC's car and took out several firearms from his red
backpack for the UC to inspect.  Altogether, LOPEZ-MENENDEZ gave
the UC the following firearms: a Walther model PPK-S .380
caliber semi-automatic pistol, bearing serial number 027146; an
M1911-type .45 caliber semi-automatic pistol with an obliterated
serial number; a Shadow Systems model MR918 9mm caliber semi-
automatic pistol, bearing serial number SSC005325; a Glock model

43 9mm caliber semi-automatic pistol, bearing serial number
BAFM743; a Heritage MFG .22 caliber revolver, bearing serial
number 3PH170518; two ghost gun short-barreled AR-type rifles
with no serial numbers; and nine ghost gun semi-automatic
pistols with no serial numbers.[8]

    32.  LOPEZ-MENENDEZ said the Glock 43, Glock 17 and the
M1911-type pistol were each $1,500, the Walther PPK-S was
$1,400, the ghost gun pistols were each $800, the ghost gun AR-
type rifles were each $1,200, and the .380 caliber semi-
automatic pistol was $1,000.  After negotiations, LOPEZ-MENENDEZ
agreed to sell all the firearms to the UC for $18,000 and
accepted $18,000 in cash from the UC for the firearms.

    33.  The following photograph shows the firearms sold by
LOPEZ-MENENDEZ on this date:



---

    [8] One of the items LOPEZ-MENENDEZ sold to the UC on February
24, 2022, resembled a firearm that had no manufacture markings
or serial number. Preliminary analysis suggests it could be a
converted blank gun.  Further analysis is needed to confirm if
it is firearm.

### E.   March 8, 2022: LOPEZ-MENENDEZ Sold Ten Pounds of Methamphetamine

34.   Over text message and telephone conversations, LOPEZ-MENENDEZ agreed to sell 10 pounds of methamphetamine to the UC at the SUBJECT PREMISES on March 8, 2022.  On that date, surveillance agents saw LOPEZ-MENENDEZ drive to a residence in Los Angeles and get into the passenger seat of a 2015 white Mercedes-Benz, four door sedan, bearing California license plate 8BKJ904, driven by an individual identified as Cristian Guerra ("Guerra").  In conversations with the UC, LOPEZ-MENENDEZ has referred to Guerra as his brother and methamphetamine supplier.

35.   Surveillance agents followed LOPEZ-MENENDEZ and Guerra to the SUBJECT PREMISES.  There, LOPEZ-MENENDEZ gave the UC a black duffel bag containing what appeared to be ten pounds of a substance resembling methamphetamine and a firearm.

36.   On or about March 28, 2022, the DEA Southwest Laboratory confirmed that the methamphetamine sold by LOPEZ-MENENDEZ on March 8, 2022, was approximately 94% pure and contained approximately 4,191 grams of actual methamphetamine.

### F.   March 23, 2022: LOPEZ-MENENDEZ Sold Five Pounds of Suspected Methamphetamine

37.   Over text message and telephone conversations with the UC, LOPEZ-MENENDEZ agreed to sell five pounds of methamphetamine to the UC at the SUBJECT PREMISES on March 23, 2022.

38.   On March 23, 2022, the UC arrived at the SUBJECT PREMISES.  LOPEZ-MENENDEZ came from the SUBJECT PREMISES, retrieved a blue bag from the SUBJECT VEHICLE, which was parked across the street on Amigo Avenue, and gave the blue bag to the

UC.  The blue bag contained what appeared to be five pounds of a substance resembling methamphetamine.

39.   The DEA Laboratory test results for the suspected methamphetamine are pending.

### G.   LOPEZ-MENENDEZ Does Not Have a Federal Firearms License

40.   On or about February 11, 2022, an ATF Industry Operations Investigator conducted a query in ATF's Firearms Licensing System, which contains information on all federal firearm licenses issued by the federal government.  The investigator determined that LOPEZ-MENENDEZ does not have a federal firearms license and is not licensed to engage in the business of dealing in firearms.

### H.   LOPEZ-MENENDEZ Does Not Have any Firearms Registered to Him in the National Firearms Registry

41.   On or about February 15, 2022, an ATF Firearms and Explosives Services Specialist conducted a query in the National Firearms Registration and Transfer Record ("NFRTR"). The NFRTR contains information on all firearms covered by the National Firearms Act ("NFA"), which includes short-barreled firearms. The specialist determined that LOPEZ-MENENDEZ does not have any firearms registered to him in the NFRTR.

### V.   TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

42.   From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct firearms and narcotics investigations, I am aware of the following:

a.    Firearms traffickers and individuals engaged in the business of dealing in firearms illegally generally maintain records of their firearm transactions, like pay-owe sheets, pricing ledgers, and supplier and customer contact lists. Because these records contain valuable information important to their trafficking activities, they keep these records in places that are secure and readily available to them, including their residence, their car, and in their digital devices, such as computers or cell phones.  These devices are often kept on or near their person, including in their pockets or personal bags or belongings, or in their residence or place of business.

b.    Firearms traffickers often have, take, and/or keep photographs and videos of firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c.    Firearms traffickers often communicate with suppliers and customers over phone calls, e-mail, text message, and social media message using smartphones, laptops, or other digital devices.  These communications include sending photos of firearms, negotiations over price and other aspects of the transaction, and arrangements to meet and conduct the sale. Illegal firearms traffickers often use their digital devices to obtain and store information about the firearms they obtain and sell, including the prices of firearms when sold through licensed gun stores.

d.   Individuals involved in illegal firearms conduct value firearms with obliterated serial numbers because the lack of an identifiable serial number makes the firearm untraceable, thus making it easier to hide and mask criminal activity involving that firearm from law enforcement.  A firearm's serial number can be obliterated using any tool or device that can render the serial number unreadable.

e.   Similarly, individuals involved in illegal firearms conduct value ghost guns because their lack of serial numbers makes the firearms both unregisterable and untraceable.

i.   Ghost guns can be assembled from commercially manufactured gun kits and separate firearms parts, including unfinished or 80% lower receivers, which do not bear serial numbers.  Polymer80 is a common brand of such gun kits.

ii.   To convert an unfinished lower receiver into a lower receiver that can be used in a functioning firearm, firearms manufacturers mill or drill the necessary holes into the receiver using tools or machinery, such as a Computer Numeric Control ("CNC") machine, drill press or a hand drill, a Dremel tool (a versatile, handheld rotary-bit tool that can be used to cut, grind, drill, sand, and mill various materials), and other various types of milling equipment like a jig or file.

iii. Illegal firearms manufacturers can build different types of ghost guns various parts, such as a ghost gun pistol with a pistol grip and a short barrel, or a ghost gun shotgun or rifle with a longer barrel and a shoulder stock.  A

manufacturer could also build a ghost gun short-barreled shotgun or rifle by combining a short barrel with a shoulder stock.

43.   Short-barreled shotguns (with barrels less than 18 inches long) and short-barreled rifles (with barrels shorter than 16 inches long) are valued by individuals engaged in illegal firearms activity because they are easier to conceal. Additionally, the shorter barrel increases the spread of fired shotgun shot.

a.   As noted above, short-barreled shotguns or firearms can be made by assembling a ghost gun with a short barrel and a shoulder stock.  They can also be made by using tools to saw off the end of the barrel of a shotgun or rifle that had the requisite length.

## VI.   TRAINING AND EXPERIENCE ON DRUG OFFENSES

44.   From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct narcotics investigations, I am aware of the following:

a.   Drug trafficking is often a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where the drug trafficker has ready access to them, such as in their residences and businesses, cars, and on their cell phones and other digital devices.

c.   Because drug traffickers usually continue to sell drugs to support themselves until they are arrested, their communications with various co-conspirators tend to be ongoing until their arrest.  Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.  It is also common for drug traffickers to carry cellular telephones in order to remain in contact with drug suppliers or customers, to communicate with co-conspirators to facilitate drug trafficking, to coordinate the movements of the trafficker and various co-conspirators, and to coordinate the amount of drugs trafficked, as well as payment

amounts and methods.  Based on my training and experience, I
know that the above-described information can be stored on
digital devices carried by drug traffickers.

       d.   Drug traffickers often keep the names, addresses,
and telephone numbers of their drug trafficking associates on
their digital devices.  Drug traffickers often keep records of
meetings with associates, customers, and suppliers on their
digital devices, including in the form of calendar entries and
location data, such as Global Positioning System ("GPS")
information, other locational information, and identifying
information about the trafficker and co-conspirators and the
location of previous drug transactions or stash houses, and/or
the identity or whereabouts of traffickers and co-conspirators
involved in narcotics trafficking.

       e.   It is common for drug traffickers to own multiple
phones of varying sophistication and cost as a method to
diversify communications between various customers and
suppliers.  These phones range from sophisticated smart phones
using digital communications applications such as Blackberry
Messenger, WhatsApp, and the like, to cheap, simple, and often
prepaid flip phones, known colloquially as "drop phones," for
actual voice communications.

       f.   Drug traffickers who deal in large quantities
often use paraphernalia such as plastic bags, vacuum sealable
bags, scales, etc. in order to divide a large amount of drugs
into smaller quantities for distribution.

## VII. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[9]

45.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

---

[9] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

       c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

       d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

46.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

47.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a

device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   Thus, as to the warrant authorizing the search of LOPEZ-MENENDEZ's person and the SUBJECT VEHICLE, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant that is found on LOPEZ-MENENDEZ's person or in the SUBJECT VEHICLE: (1) depress LOPEZ-MENENDEZ's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of LOPEZ-MENENDEZ's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

d.   As set forth above, I believe the SUBJECT PREMISES is a property used by LOPEZ-MENENDEZ, Ojeda, and Delgadillo to manufacture and store guns and possibly store drugs.  I know, based on my training and experience, that, in order to protect valuable drugs, firearms, and trafficking proceeds at a stash house, traffickers do not permit those who

are uninvolved in the gang's trafficking business to be at the stash house.  In my training and experience, digital devices found in stash houses like the SUBJECT PREMISES may not have a clearly identifiable user based on the exterior of the device and/or may have multiple users whose biometric features may unlock the devices because drug traffickers share digital devices on which to coordinate drug trafficking and the laundering of drug trafficking proceeds.  Thus, if while executing the warrant at the SUBJECT PREMISES, law enforcement personnel encounter a digital device within the scope of the warrant that may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to, with respect to every person who is located at the SUBJECT PREMISES during the execution of the search who is reasonably believed by law enforcement to be a user of a biometric sensor-enabled device that falls within the scope of the warrant: (1) depress the person's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of the face of the person with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

48.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VIII.    CONCLUSION

49.  For all the reasons described above, there is probable cause to believe that JULIO ERNESTO LOPEZ-MENENDEZ violated 21 U.S.C. §§ 841(a)(1), 846 (possession with intent to distribute

and distribution of drugs, and conspiracy); 18 U.S.C.

§ 922(a)(1)(A) (engaging in the business of dealing in firearms

without a license); and 26 U.S.C. § 5861(d) (Possession of an

Unregistered Firearm).

50.   Further, there is probable cause to believe that the

items listed in Attachment B, which constitute evidence, fruits,

and instrumentalities of violations of the SUBJECT OFFENSES,

will be found at the SUBJECT PREMISES, on the person of LOPEZ-

MENENDEZ, and in the SUBJECT VEHICLE, as described in

Attachments A-1, A-2, and A-3, respectively.

/s/
_____
Andrew Grigoriadis, Special
Agent
Federal Bureau of
Investigation

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this __8__ day of
April 2022.

_____
HONORABLE MARIA A. AUDERO
UNITED STATES MAGISTRATE JUDGE